# Richmond

## L. HUNTER MORRIS, JR. v. F. C. DAME'S EXECUTOR AND THE TOWN OF CHRISTIANSBURG.

November 16, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

548

The opinion states the case.

*Milton P. Bonifant* and *M. J. Fulton,* for the plaintiff in error.

*Sowder, Roop & Spiers* and *William H. Colhoun,* for the town of Christiansburg.

*Horace M. Fox* and *Furman B. Whitescarver,* for Dame's executor.

Epes, J., delivered the opinion of the court.

This is an action, instituted by notice of motion for judgment, which was brought by L. Hunter Morris, Jr., a young man nineteen years old, suing by his next friend, against F. C. Dame and the town of Christiansburg. Its object is to recover damages for personal injuries received by Morris in a collision which occurred late in the afternoon of April 18, 1930, between an automobile truck owned by Dame and a truck owned by the town of Christiansburg. The Dame truck was being driven by one of his workmen, and the truck of the town of Christiansburg was being driven by one of its employees. Neither of the drivers was made a party defendant. The plaintiff was riding in the Dame truck with the permission of its driver.

Dame died soon after the action was instituted, before he had filed any pleadings. The Farmers National Bank of Salem qualified as his executor, and upon its motion the case was revived against it as such.

The case was submitted to a jury on the evidence introduced by the plaintiff and that introduced by the town of Christiansburg. Dame's executor introduced no evidence. taking the position that the evidence was insufficient to support a verdict finding Dame liable. The jury returned a verdict for both defendants, in accordance with which the court entered judgment. To this judgment the plaintiff has applied for and been granted a writ of error against both defendants.

The plaintiff's notice, when read in the light of the evidence, alleges that the collision was due to the concurring negligence of the drivers of the Dame truck and the Christiansburg truck, and to the fact that the Dame truck was

being operated "with inadequate and improperly adjusted brakes."

The town of Christiansburg filed no affidavit denying that it owned, operated or controlled one of the trucks. See section 6126, Code Va. 1919.

The defenses made by it were that its driver was not guilty of any negligence, that the sole proximate cause of the collision was the negligence of the driver of the Dame truck, and that the plaintiff was guilty of contributory negligence which barred any recovery by him. The contributory negligence charged by it is (1) that the plaintiff failed to keep a proper lookout, and (2) that he "was standing up. in the rear part of the said Dame's truck when he should have been seated, and but for said standing up * * * the plaintiff would not have been hurt or injured."

Dame's executor filed a plea of the general issue, and also what amounts to a plea of contributory negligence. The charges of contributory negligence contained in its plea are (1) that the plaintiff "was guilty of negligence in riding in, or on, or about said truck at a place other than the seat built for and incidental to the operation of the said truck," and (2) that he "was standing up in the body of said truck, and/or was otherwise located in, on or about said truck at such a place and in such a manner as to be in constant danger of injury from the operation of said truck on the highway."

Dame's executor also filed an affidavit made by John R. Keister. After stating that Keister is the cashier and trust officer of Farmers National Bank, the executor of F. C. Dame, and "is entitled as such officer to make this affidavit on behalf of said executor," the affidavit reads:

"Upon information and belief, this affiant says:

"That the truck of the defendant's decedent (F. C. Dame) was not at the time of the happening of the alleged injuries to the plaintiff being operated or driven by defendant's decedent, F. C. Dame.

"That the plaintiff, L. Hunter Morris, Jr., was not at said time riding in, on or upon said truck with the knowl-

edge, permission or consent, or by or with the authority, direct or indirect, of defendant's decedent, F. C. Dame.

"That the driver of defendant's decedent's (F. C. Dame's) truck had no authority except to drive said truck from Wytheville to Roanoke, and that said driver had not and was not by defendant's decedent, F. C. Dame, authorized to permit plaintiff to ride in, on or upon said truck."

The following account given by the plaintiff (whom we shall hereafter refer to as Morris) and his witnesses of how he came to be riding in the Dame truck at the time of the collision is uncontradicted.

Morris lived in Richmond, Virginia, and was a cadet at the Virginia Polytechnic Institute at Blacksburg. On the afternoon of April 18, 1930, the cadets were leaving to go to their homes and other destinations for the Easter holidays. That afternoon Morris, A. M. Potts, R. K. Allen and several other cadets left Blacksburg in a taxicab and went to Christiansburg, where they intended to solicit free rides in automobiles going towards their several destinations.

As they got out of the cab in Christiansburg, Morris saw a truck approaching along the street which forms a part of the Lee highway, going towards Roanoke. This truck belonged to F. C. Dame, and was being driven by one of his workmen. It was a one-ton Republic freight truck with a cab in front for the driver and an open-top body in the rear for carrying freight. The sides of the body were of such height that a person sitting on the top railing of a side could rest his weight on his feet on the floor. In the body of the truck were some scrap iron, pipe or tile, and a few tools. The driver and another man were sitting on the seat in the cab and there were three men in the body of the truck.

Morris, followed by Potts and Allen, ran across the street, and Morris gave a signal with his hand indicating that he wanted to go towards Roanoke. The truck stopped about twenty feet beyond them and the driver looked back. They ran up to it and got on it, Potts being the

last to get on. Before he had gotten "completely on," the driver looked back and said, "Is everything O. K.?" When Potts had gotten on Morris said, "Everything is O. K., let her ride;" and the driver drove east, towards Roanoke. The collision occurred about a mile east of Christiansburg.

No other evidence was introduced which tended in the remotest degree to show that the plaintiff was riding on the truck with Dame's knowledge, permission or consent, or that the driver of the truck had any actual, implied or ostensible authority to invite or permit him, or anyone else, to ride in it.

There is no material conflict in the evidence as to the place at which the collision took place or the physical features of its surroundings. The chief difference between the testimony introduced on this phase of the case by the plaintiff and that introduced by the town of Christiansburg is that the surveyor introduced by the town gives actual measurements, while in most instances the plaintiff's witnesses give estimates. The estimates, however, are in substantial accord with the measurements of the surveyor.

About a mile east of Christiansburg the Lee highway, which along this part of its course runs approximately east and west, crosses a spur track of the Norfolk and Western Railway Company, which runs approximately north and south. At this crossing there is a large railroad-crossing sign which is plainly visible to a person traveling east on the Lee highway at any place within 1,200 feet, or more, west of the crossing.

A few feet west of this crossing a side road leads off from the north side of the Lee highway, and runs, about parallel with the railroad's spur track, to the plant of the Standard Oil Company. Further west (140 feet west of the crossing) a side road leads off from the south side of the highway and, roughly paralleling the railroad's spur track, runs southward about 400 feet to the Christiansburg Supply Company's plant, where it ends. This road, which we

shall designate the freight-yard road, enters but does not cross the Lee highway, and opposite its junction with the highway there is a bank nine feet high along the north side of the highway. The collision occurred on the north side of the Lee highway immediately opposite the mouth of the freight-yard road, out of which the Christiansburg truck had come. Along there the hard-surfaced part of the highway is eighteen feet wide, on each side of which are dirt shoulders six feet wide.

On the south side of the highway and east of the freight-yard road is a filling station and restaurant. Further south, on the east of the freight-yard road, is a much-used freight yard of the Norfolk and Western Railway Company, and the plants of the Old Dominion Canning Factory and the Christiansburg Supply Company. The only buildings or obstructions to the view on the west side of the freight-yard road are two buildings of the Texas Oil Company, which stand in an area enclosed by a high wire fence that extends to a line about forty feet from the southern edge of the hard-surfaced part of the Lee highway. When a person is standing in the freight-yard road at any point within thirty-eight feet of the southern edge of the hard-surfaced part of the Lee highway, he has a clear view to the west along the highway for 1,200 feet or more.

The freight-yard road is not a State or county road; but it is "open to the use of the public for the purpose of vehicular travel" and is much used by the public in going to and from the railroad freight yard and the plants situated along it. It clearly comes within the definition of a "highway" as distinguished from a "private road or driveway" as these terms are defined in the "uniform act regulating the operation of vehicles on highways." Acts 1926, ch. 474, pp. 766-767.

Morris testified that he was familiar with this locality and its physical features, and knew that this railroad crossing was there.

The only witnesses introduced by Morris who testified as to what occurred at the time of the collision were Mor-

ris and his two companions, Allen and Potts. With the matter in parentheses supplied from the testimony of Allen and Potts, Morris' testimony on this phase of the case is as follows:

As the truck approached the place of the collision Morris (dressed in citizen's clothes) was sitting on the right side of the body of the truck, just in rear of the cab, resting most of his weight on his feet, which were on the floor. He was holding to the body with his left hand and had his right hand on the top of the cab. His head was above the top of the cab and he could see over it. Allen and Potts (who were dressed in the blue caps, blue blouses and gray trousers worn by V. P. I. cadets) were sitting on the floor of the truck (on some pipe or tile). The three white men who were in the truck when the boys got in were sitting on the side of the body of the truck on its left side.

There was an elliptical window in the back of the cab three inches wide and seven inches long. When the truck was some three hundred yards from the place of the collision, Morris looked through this window and saw that the speedometer was registering forty miles an hour. When they were in about 225 feet of the place of the collision, the driver slowed down "a trifle," and Morris "glanced down" and saw the Christiansburg truck (a model T Ford truck heavily loaded with gravel) moving along the freight-yard road towards and a short distance from the highway. At first he did not know whether it was going to stop or not; but when they got within from 175 to 200 feet of it, the Christiansburg truck came to a "momentary" stop with its front wheels approximately at the edge of, but off, the hard-surfaced part of the highway.

"At this time" the driver of the Dame truck took his foot off the brake and "proceeded as he had been on down the highway" at about thirty-five miles an hour. When the Dame truck, he estimates, was about "sixty or seventy feet" from the mouth of the freight-yard road, "it may have been more or it may have been less than that," the Christiansburg truck started forward and moved out into

the highway and on across it to its left or north side, "moving very slowly," its speed being, he estimates, "about five or ten miles" an hour.

As soon as the Christiansburg truck started forward, the driver of the Dame truck applied his brakes and cut his truck to the left. "I saw there was going to be an accident and just remained seated as I was." Though the driver of the Dame truck succeeded in slowing it down, it was still going from twenty to twenty-five miles an hour when it collided with the Christiansburg truck.

As the Dame truck approached the point of collision and when its driver cut it to the left, it was traveling "about the center" of the highway. When the collision took place the Christiansburg truck was on the left or north side of the Lee highway, with its length almost perpendicular to the axis of the highway, its fore wheels almost at the bank along the north side of it, and its rear end "just about the center" of the hard-surfaced part of it. (The right front wheel or right front fender of the Dame truck struck the Christiansburg truck on its left side about the door of the cab.) The force of the impact knocked the front end of the Christiansburg truck around towards the east. All the occupants of the body of the Dame truck were thrown out, and Morris was severely injured.

The driver of the Christiansburg truck gave no signal or warning of his intention to proceed into or turn into the Lee highway, and the driver of neither truck sounded his horn.

After the collision, Morris, Potts and Allen saw one dark mark on the surface of the highway such as is made when a rubber-tired wheel is locked and dragged along a hard-surfaced road. There was nothing to indicate that but one wheel had slipped or been dragged along the highway. Morris testified that this mark began about the center of the highway, about twenty-five feet from the place of the collision, extended eastward, bearing to the left, and was about twenty or twenty-five feet long. He says that "it seemed like one of the rear wheels caught" and that

"it seemed like from the way the trucks were that it was [made by] the *left* rear wheel (of the Dame truck). I couldn't say for sure." Potts says the skid mark was about twenty-five feet long and was made by the *right* rear wheel of the Dame truck. Allen testified that "the *right* wheel (of the Dame truck) left a black skid mark for twenty-five or thirty feet," that he was positive the skid mark was made by the right rear wheel, and that he did not see any skid mark made by the left wheel.

The plaintiff's witnesses also testified that if the brakes of an automobile are adjusted so that the pressure applied to the wheel or wheels on one side of it is greater than that applied to the wheel or wheels on the other, the wheel or wheels on which the pressure is greater will lock, while the other wheels will continue to rotate; and that this will, if not counteracted by the use of the steering apparatus, turn the front of the automobile towards the side on which the wheel is locked. (This was also testified to by experts introduced by the town of Christiansburg.)

At the conclusion of the plaintiff's evidence Dame's executor moved the court to strike out, as to it, all the plaintiff's evidence. One of the grounds of this motion was that Dame's executor had filed an affidavit denying that the driver of Dame's truck had any authority to invite or permit Morris to ride in the truck, and that there was no evidence to show that the driver had an express, implied, or ostensible authority to do so. The court overruled this motion and Dame's executor excepted.

Plaintiff then moved the court to strike out the affidavit filed by Dame's executor, which motion the court overruled.

The grounds stated for this motion were, "the executor making the affidavit had no knowledge of the facts stated therein, the suit was brought in the lifetime of Dame, during his lifetime he made no affidavit; and the affidavit that Morris, the plaintiff, was not riding in or upon the truck with the permission, knowledge and consent, or authority, of Dame is not such an affidavit as is authorized by sec-

tion 6126 of the Code to be made by the executor of an estate, or to be made at all." Though the plaintiff excepted to this ruling, he does not here assign it as error.

The evidence introduced by the town of Christiansburg which is in conflict with or is supplementary to the evidence introduced by the plaintiff was, so far as need be stated here, as follows:

The Christiansburg truck was an old (1923 or 1924) one-ton T model Ford truck, and had a length over all of thirteen and one-half feet. It was being used to haul gravel to Christiansburg from a pile situated on the east side of the side road, between 100 and 300 feet south of the highway; and at the time of the collision it was loaded with about a cubic yard of gravel.

A. D. Stone was driving the Christiansburg truck. His account of the accident is this: When the front wheels of his truck were from eight to ten feet from the southern edge of the hard-surfaced part of the highway, he stopped his truck "just long enough to look." He looked both east and west along the highway, but saw no cars approaching from either direction. Where he stopped he could have seen east along the highway for about 100 feet and west along it to the Fox Farm, i. e., for about 1,200 feet. He put his truck in low gear and moved forward, and as he came "into" the highway he began making a turn towards Christiansburg, i. e., to the left. When the front of his truck had gotten about half way across the hard-surfaced part of the highway he saw, for the first time, the Dame truck approaching from the west. It was then "about the Fox Farm," which is 1,100 feet west of where he was. It looked to him "like it was running about as fast as the truck could get about." He drove on across the highway, "straightening out" towards Christiansburg; and when he had gotten so far across and so far "straightened out" towards Christiansburg that his right front wheel was off the hard-surfaced part of the highway and on its northern dirt shoulder, the Dame truck ran into his truck, striking it on its right side about opposite the steering wheel.

Lindsey, another witness for the town, testified that when Stone stopped he saw him turn his head as if to look both east and west along the highway.

Ernest Woods, who was standing at the gravel pile, testified that he saw Stone leave the gravel pile, drive toward the Lee highway and bring his truck to a stop with its front wheels about at the edge of the dirt shoulder of the highway. When Stone was about forty feet from the highway, he (Woods) "heard a roar from a truck," looked up the highway and, looking to the south of the Texas Oil Company buildings, saw the Dame truck coming east along the highway. It was then about opposite the road to the athletic field (which the surveyor testified was 1,000 feet from the place of collision). When Stone brought his truck to a stop "it looked as if the Dame truck were 500 feet up the road." It was "making practically all it could make," it was not "making under forty" miles an hour.

Woods and several other witnesses introduced by the town testified that there were some men or boys in the Dame truck, that two of them had on V. P. I. cadet uniforms, and one of them had on citizen's clothes, but these three appeared to them to be standing up at the back of the cab, the one in citizen's clothing standing on the right of the other two.

H. C. Wirt, who was also at the gravel pile, did not see the Dame truck until just before the collision. His attention was attracted by "the brakes either squeaking or sliding on the hard surface," but he thought it was the sliding of the wheel of the Dame truck on the hard surface that caused him to look around. After the collision he saw where the *left* rear wheel of the Dame truck had "scraped" the hard surface. "Just one" of the wheels made a mark on the surface of the road. From where it began to where the wheel of the Dame truck was after the collision was ninety feet.

Several other witnesses introduced by the town testified that they heard the brakes of the Dame truck squeak or its wheels sliding on the hard surface of the road, and

that its *left* rear wheel made a skid or sliding mark for a distance of "thirty long steps" or "ninety feet."

R. J. Bolton was at his father's canning factory near the gravel pile. He testified to the following effect. The Christiansburg truck stopped "momentarily" when it was six or eight feet from the hard-surfaced part of the highway. When the Christiansburg truck had gotten "I would say one-third of the way out" into the highway, he (Bolton) saw the Dame truck for the first time. It was then "around 100 feet, maybe a little more," from the Christiansburg truck. When the collision occurred the front wheels of the Christiansburg truck were on the northern shoulder of the highway, its extreme rear was approximately in the center or just to the right of the center of the highway, and its length was making an angle of approximately forty-five degrees with the highway.

At the conclusion of the evidence for the town, Dame's executor moved the court to strike out, as to it, all the evidence. Among other grounds this motion was made upon grounds which, in effect, are as follows:

There is no evidence sufficient to support a verdict predicated upon a finding that either Dame or the driver of his truck was guilty of wantonly or wilfully injuring the plaintiff, or of any gross negligence; and, therefore, the plaintiff is not entitled to recover for two reasons:

(a) There is no evidence sufficient to support a verdict finding that the driver of Dame's truck had any authority, express or implied from him to invite or permit the plaintiff to ride in his truck. This being true, *quoad* Dame the plaintiff stands before the court in no better position than he would stand were it affirmatively established that the driver had no such authority, that is, in no better position than that of a trespasser; and he is not entitled to recover against Dame's executor unless Dame or his driver was guilty of wantonly or wilfully injuring him.

(b) Even if Dame's driver did have such authority, the plaintiff was, as a matter of law, at most a mere guest of Dame; and the plaintiff is not entitled to recover unless

Dame or his driver was guilty of gross negligence or of wantonly or wilfully injuring him.

As we shall hereafter see, all of these contentions were well made, and the court should have sustained this motion, but it overruled it. To this ruling Dame's executor excepted. However, in overruling the motion the court stated that it would hold that under the evidence "the plaintiff was a trespasser [as to Dame] and that the only duty that the defendant Dame owed him was not to wantonly or wilfully injure him, and that he would submit this question to the jury."

The case was submitted to the jury under the instructions of the court; and, as has been said, the jury returned a verdict for both defendants. The court refused to set aside the verdict and entered judgment for both defendants.

At the time the case was tried this court had not handed down its opinion in *Boggs* v. *Plybon,* 157 Va. 30, 160 S. E. 77; but it had done so at the time the court refused to set aside the verdict and entered judgment.

All the assignments of error relate to the giving and refusing of instructions. They fall into three classes, (1) those relating to instructions given at the request of the town, (2) those relating to instructions given at the request of Dame's executor, and (3) those relating to the court's refusal to give certain instructions asked for by the plaintiff.

The court gave at the request of the town of Christiansburg three instructions, numbered 1, 2 and 3. Instruction No. 2 and the material parts of instruction No. 3 read:

Instruction No. 2.—"The court instructs the jury that if you believe from the evidence that the operator of the Dame truck was driving his truck under the circumstances prevailing at the time in a reckless and negligent manner or at an excessive speed or reckless speed, and that the plaintiff was in a position to know and in fact did know such was being done, it was his duty to protest to the driver against such speed or reckless and negligent driving if you believe from the evidence he was in a posi-

tion wherein he could do so. And if you believe he failed to so protest and that the speed and recklessness of the driver of the Dame truck proximately contributed to his injury, then he was guilty of contributory negligence that will preclude any recovery in this case."

Instruction No. 3.—"* * * if you believe from the evidence that the plaintiff was standing up in or sitting down on the side of the body of the Dame truck at the time of the accident, * * * that such action * * * was a failure to exercise reasonable or ordinary care for his safety * * * and proximately contributed to his injury, then you cannot find against the town of Christiansburg, even though you may believe that the driver" of its truck was guilty of negligence.

The court erred in giving instruction No. 2 for the reason that there is no evidence sufficient to support it.

█ There is no evidence sufficient to support a verdict finding that prior to or at the time that the plaintiff first saw the truck of the town of Christiansburg, the driver of the Dame truck had been or was guilty of driving in a reckless or negligent manner or at an excessive speed. The uncontradicted evidence is that the driver of the Dame truck saw the Christiansburg truck as soon as, or before, the plaintiff saw it, and showed his consciousness of its position, proximity and movements; and the evidence fails to show any fact or circumstance which should have put the plaintiff on guard that the driver of the Dame truck would not use all precautions necessary to prevent a collision with it. Under these circumstances no duty rested upon the plaintiff to warn the driver of the proximity of the Christiansburg truck or to protest against the speed at which he was driving.

█ The court also erred in giving instruction No. 3. Even if it be assumed that, whether he was standing up in or sitting on the side of the body of the truck, the plaintiff was not in all respects using the proper care for his own safety, there is no evidence which is sufficient to sustain a verdict predicated upon a finding that by so doing he contributed to the event which resulted in his injury in

such a way as to bar his recovery against the town of Christiansburg.

Not every act of negligence which a plaintiff is committing at the time an event occurs that results in injury to him will bar his recovery against the person whose negligence was a proximate cause of the event. To bar his recovery his negligence must have been a failure to use due care with respect to the event which resulted in his injury, and must have borne such a relationship to that event that, if he himself had not been negligent, he would have received no injury from the negligence of the defendant. It is not sufficient to bar his recovery that, if he had not been negligent, the event *might* not have resulted in his being injured, or *might*, or even would not have resulted in injuring him as seriously as it did. 1 Thompson on Neg., section 221; 1 Sherman & Redf. on Neg. (6th Ed.), section 95; *Thirteen, etc., Passenger Ry.* v. *Boudrou*, 92 Pa. St. 475, 37 Am. Rep. 707; *Smithwick* v. *Hall & Upson Co.*, 59 Conn. 261, 21 Atl. 924, 12 L. R. A. 279, 21 Am. St. Rep. 104; *New Jersey Exp. Co.* v. *Nichols*, 33 N. J. Law, 434, 97 Am. Dec. 722; *Matassarin* v. *Wichita R., etc., Co.*, 100 Kan. 119, 163 Pac. 796; *Adams* v. *Parrish*, 189 Ky. 628, 225 S. W. 467. See, also, *Shenandoah Val. R. Co.* v. *Moose*, 83 Va. 827, 3 S. E. 796.

Under *all* the evidence in this case the plaintiff's position in the truck was merely a condition of the collision and his resulting injury, not a proximate cause of it. It *may* have been a condition which accounted for his being as severely injured as he was, and for his being more severely injured than were the others in the Dame truck, though this is purely conjectural; but under no aspect of the evidence was it a proximate contributing cause of his being injured. See cases last above cited, and *Wirth* v. *Pokert*, 19 La. App. 690, 140 So. 234; *Hawthorne* v. *Gunn*, 123 Cal. App. 452, 11 Pac. (2d) 411.

Instruction No. 1, given at the request of the town of Christiansburg, reads:

"The court instructs the jury that although the law of

Virginia provides that all motor vehicles entering a State highway from the side thereof must do so at a speed not in excess of five miles per hour, yet the court tells the jury that they must give a reasonable application to said law and that a motor vehicle entering a State highway from the road mentioned in the evidence is not required to stop and wait for vehicles traveling on said highway, but only to exercise such care as an ordinarily prudent person would use under the circumstances existing at the time of entering said highway for his own safety and for the safety of others; and so the court tells the jury if you believe from the evidence that an ordinarily prudent person would, under the circumstances, have believed he could safely enter and cross the said highway to the right side thereof without giving signals and without danger to himself or others, and that the driver of the Christiansburg truck in entering and crossing said highway used such care as an ordinarily prudent person would have used under the circumstances, then, under the circumstances the driver of the Christiansburg truck is not guilty of negligence and the jury should find in favor of the defendant, the town of Christiansburg."

The court erred in giving this instruction. It is reaching out after principles of law of which cognizance had not been taken in the plaintiff's instruction A-1,[1] but it misses them.

---

[1] The material parts of plaintiff's instruction A-1 read:

"The court instructs the jury that the statute law of Virginia defines reckless driving to mean:

"(1) The operation of a vehicle in a manner potentially offering harm or injury or damage to any person, property or thing as a result of the act itself or in combination with circumstances, conditions and acts of others; or * * *

"(4) Making a left turn without passing the center point of the intersection, whether marked or not, and without first signaling his intention so to turn;

"In this connection the court tells the jury that if they believe from the evidence that the defendant, the town of Christiansburg, violated any of the foregoing provisions of the statute, then such defendant was guilty of reckless driving; and if they believe such reckless driving proximately caused or effectively contributed to cause the plaintiff's injuries and damages complained of in his notice of motion for judgment, then they should find their verdict against the defendant, the town of Christiansburg."

■ The Virginia statute prescribing rules for the operation of vehicles on the highways provides that before the driver of a vehicle shall make either a left or a right turn at a road intersection he shall give the prescribed signal for such a turn at least fifty feet before making the turn; and that the violation of this, or any other provision of the statute, shall be a misdemeanor and be punishable by a fine and/or imprisonment. Acts 1926, ch. 474, section 3, sub-section c, and section 18, as amended by Acts 1928, ch. 399, p. 1021; Michie's Code Va. 1930, section 2145 (4), pars. 9 and 10, and section 2145 (19). These provisions of the statute create a *general* duty on the part of drivers of motor vehicles to give the prescribed signal before making a left or right turn at a road intersection. But a failure to give the signal cannot be actionable negligence as to any particular person unless the facts and circumstances of the case are such that the duty to give the signal has become a particular duty owing to that person as an individual.

■■ For the *general* duty imposed by the statute to become a particular duty owing to a particular person, he must be in a position which, under a reasonable construction and interpretation of the statute, brings him within the particular class of persons for whose protection from injury these provisions of it were enacted. When the general duty imposed by the statute has become a particular duty owing to a particular person, the failure to give the prescribed signal becomes actionable negligence as to him, *provided* (1) that the failure to comply with the statute is not excusable,[2] and (2) that the failure to give the required signal is the proximate cause of an injury to him which is one of the consequences contemplated by this provision of the statute and that it was intended to

[2] For cases holding or recognizing that a violation of such a statute may be excusable, see: *Mora* v. *Favilla,* 186 Cal. 199, 199 Pac. 17; *Walker* v. *Lee,* 115 S. C. 495, 106 S. E. 682; *Christopherson* v. *Custom Laundry Co.,* 179 Minn. 325, 229 N. W. 136; *Lancaster* v. *B. & H. Coach Line,* 198 N. C. 107, 150 S. E. 716; *Gilbert* v. *Solberg,* 157 Wash. 490, 289 Pac. 1003; *Bolivar* v. *Monnat,* 232 App. Div. 33, 248 N. Y. S. 722; *Gaines* v. *Campbell,* 159 Va. 504, 166 S. E. 704.

prevent. 46 C. J. (Neg.), sections 107, 113, 114; 1 Sherman & Redfield on Neg. (6th Ed.), sections 27 and 27a; 9 Ann. Cas., note p. 427; *Di Caprio* v. *N. Y. Cent. R. Co.,* 231 N. Y. 94, 131 N. E. 746, 747, 16 A. L. R. 940; *Cooper* v. *Agee,* 222 Ala. 334, 132 So. 173; *Hamilton* v. *Minneapolis Desk Mfg. Co.,* 78 Minn. 3, 80 N. W. 693, 694, 79 Am. St. Rep. 350; *Mechler* v. *McMahon,* 184 Minn. 478, 239 N. W. 605; *Hansen* v. *Kemmish,* 201 Iowa 1008, 208 N. W. 277, 45 A. L. R. 498; *Carter* v. *Redmond,* 142 Tenn. 258, 218 S. W. 217; *Franklin* v. *Houston Elec. Co.* (Tex. Civ. App.), 286 S. W. 578; *Anderson* v. *Wells,* 220 Mo. App. 19, 273 S. W. 233; *Platt* v. *Southern Photo Material Co.,* 4 Ga. App. 159, 60 S. E. 1068; *Indiana, etc., Co.* v. *Neal,* 166 Ind. 458, 77 N. E. 850, 9 Ann. Cas. 424; *Figone* v. *Guisti,* 43 Cal. App. 606, 185 Pac. 694; *Flynn* v. *Gordon* (N. H.), 165 Atl. 715.

■ Under a reasonable construction of a statutory provision such as those here under consideration, when no practicable or reasonable degree of care and diligence for the safety of another would call for the performance of an act required thereby, no duty to do the act arises to him as an individual. 1 Sherman & Redfield on Neg. (6th Ed.), section 11, p. 21. Or to state it in another way, when a person is in a position such that no practicable or reasonable degree of care and diligence for his safety would call for the performance of an act prescribed by the statute, he is not in the particular class of persons for whose protection from injury the provision of the statute requiring the act was enacted.

Certainly in many cases, and perhaps in most cases, the facts and circumstances which operate to prevent a person from coming within the particular class for whose protection the statute was enacted, will also operate to prevent the failure to do the act prescribed by such a statute from being the proximate cause of an injury which is a sequence of the act. But this does not change the fundamental proposition that under those facts and circumstances there was no particular duty owing to the person injured to do the act.

 Applying this principle to the provisions of the statute here under consideration, when the driver of an automobile is in such a position that a reasonably prudent man in the exercise of ordinary care and vigilance would, under all the circumstances of the case, have reasonable grounds for apprehending that his making a left or right turn at a road intersection might affect the operation of another vehicle on the highway into which he intends to turn (that is, require any care or action on the part of the driver of the other vehicle to avoid a collision other than not to increase his speed to one beyond what is a lawful speed along that part of the highway) those in the other automobile are in the particular class of persons for whose protection the provisions were enacted. Otherwise they are not, and the driver of the automobile making the turn owes no particular duty to them to give the signal prescribed by the statute.

This, however, is materially different from saying that if an ordinarily prudent person about to enter and turn to the left on a highway at a road intersection "would, under the circumstances, have believed he could safely enter and cross the said highway to the right side thereof without giving signals [as required by the statute] and without danger to himself or others, and that * * * in entering and crossing said highway [he] used such care as an ordinarily prudent person would have used under the circumstances," then he was not guilty of any actionable negligence in so doing.

The court gave instructions Y and Z at the request of Dame's executor, the giving of which the plaintiff assigns as error. These instructions read:

Instruction Y: "The court instructs the jury that the driver of the Dame truck had no authority, express or implied, to permit plaintiff to ride upon the truck, and therefore unless you believe from the preponderance of the evidence that the plaintiff's injuries were wantonly inflicted by the driver of Dame's truck, you must find for the defendant, F. C. Dame's personal representative.

"The court further instructs the jury that to constitute wanton negligence it is necessary that there be shown an entire absence of care of the safety of others which exhibits indifference to consequences."

Instruction Z: "The court instructs the jury that though you may believe from the evidence that the driver of the Dame truck was guilty of negligence or even of gross negligence, yet you shall find for the defendant Dame's representative unless you further believe from the evidence that the plaintiff's injuries were wantonly inflicted as defined in these instructions."

The court committed no reversible error against the plaintiff in giving these instructions. It should, however, have sustained the motion of Dame's executor to strike out, as to it, all the evidence for the reasons heretofore mentioned as having been assigned when it was made.

There is no evidence sufficient to support a finding that Dame or the driver of his truck was guilty of wilfully or wantonly injuring the plaintiff, or of any act or omission which amounted even to gross negligence. Under the most favorable view from the plaintiff's standpoint which can be taken of the evidence in this case, the utmost of which either Dame or his driver could be found guilty, was simple negligence.

There is evidence tending to show that Dame's driver was guilty of acts or omissions which the "Uniform Act Regulating the Operation of Vehicles on Highways" (paragraph (w), p. 767, section 2, p. 768, and section 3 (c), p. 769, Acts 1926, ch. 474, as amended by Acts 1927 (Ex. Sess.), ch. 66, p. 158) declares shall constitute "reckless driving," and for the doing or omission of which the act provides a punishment by fine and/or imprisonment. But "reckless driving" as used in that act is a class name used to demonstrate that class of violations of the provisions of the act for which the General Assembly deemed it proper to provide somewhat heavier minimum penalties than are provided for other violations of its provisions. It is not used with reference to the law of torts. Whether an act

or omission which is a violation of this statute constitutes recklessness (in the sense of wantonness) within the purview of the law of torts depends upon the facts and circumstances of the case, and not upon its classification in this statute under the class denominated "reckless driving." And unless it constitutes recklessness or wantonness under common-law principles, it is actionable or not according to the principles applicable to negligence, as distinguished from the principles applicable to the wilful, wanton, or reckless injury of another.

This being true, it is not necessary to discuss the question: For what wanton or wilful injuries inflicted by a servant driving an automobile is the master liable where the injured person is riding in the automobile by the sufferance, permission, or invitation of the servant given without the express or implied authority of the master? And what we shall hereafter say is said with reference to injuries inflicted by negligence, whether it be simple or gross, as distinguished from injuries wilfully, wantonly or recklessly inflicted.

The pertinent questions raised by the assignments of error relating to instructions Y and Z are: (1) Did the court err in instructing the jury that "the driver of the Dame truck had no authority, express or implied, to permit the plaintiff to ride upon the truck?" (2) Did it err in instructing the jury, in effect, that Dame was not liable to the plaintiff for the negligence either of himself or of his driver, not amounting to the wilful, wanton or reckless injuring of him? Both of these questions, we think, must be answered in the negative.

The affidavit filed by Dame's executor was admissible under and a sufficient compliance with section 6126,[3] Code Va. 1919. If no such affidavit had been filed the

---

[3] Section 6126, Code Va. 1919: "Where a bill, declaration or other pleading alleges that any person or corporation, at a stated time owned, operated or controlled any property or instrumentality, no proof of the fact alleged shall be required unless an affidavit be filed with the pleading putting it in issue."

plaintiff would have been relieved by section 6126 of the necessity of proving that the driver had the authority, express or implied, of his master to suffer, permit, or invite the plaintiff to ride in the truck. *Green* v. *Lum,* 147 Va. 392, 137 S. E. 484. But when this affidavit was filed it put the driver's authority to do so in issue, and the burden rested upon the plaintiff (as in the absence of such a statute it would have done upon a plea of the general issue) to prove that the driver had such authority, expressed or implied. *Barnes* v. *Hampton,* 149 Va. 740, 743, 141 S. E. 836; *Collar* v. *McMullin,* 107 W. Va. 440, 148 S. E. 496; *Id.,* 107 W. Va. 645, 150 S. E. 2; *Monnet* v. *Ullman,* 129 Ore. 44, 276 Pac. 244; *Zavodnick* v. *Rose & Son,* 297 Pa. 86, 146 Atl. 455; *Barker* v. *Dairymen's Milk Products Co.,* 205 Ala. 470, 88 So. 588.

Where authority is claimed by the driver of a truck to invite or permit the plaintiff to ride, it is not necessary for the master or owner to negative such authority or to show the lack of it, but the burden is on the plaintiff to establish such authority by the evidence. *Barker* v. *Dairymen's Milk Products Co., supra.*

The fact that a person is driving an automobile (whether it be an ordinary passenger car or a freight truck) does not of itself clothe him with ostensible authority from any other person to suffer, permit, or invite a person who hails him on the road to ride therein. Proof that a driver was driving an automobile on his master's business, that there were others riding in it when the plaintiff hailed him and asked him for a ride, and that the driver suffered, permitted or invited him to get in and ride, is not sufficient to support a verdict finding that the driver had either express or implied authority from his master to suffer, permit or invite him to do so. See following cases in which the servant was driving a freight automobile truck, *Monnet* v. *Ullman,* 129 Ore. 44, 276 Pac. 244; *Barker* v. *Dairymen's Milk Products Co.,* 205 Ala. 470, 88 So. 588; *Bobos* v. *Krey Packing Co.,* 317 Mo. 108, 296 S. W. 157; and the following cases in which the servant was

driving a passenger automobile, *Collar* v. *McMullin,* 107 W. Va. 440, 148 S. E. 496, and *Id.,* 107 W. Va. 645, 150 S. E. 2; *White* v. *Brainerd Service Motor Co.,* 181 Minn. 366, 232 N. W. 626; *Bilow* v. *Kaplan,* 11 N. J. Misc. 108, 164 Atl. 694. See, also, Blashfields Cyclopedia of Automobile Law, pp. 792, 1379, 1381; *Norfolk & Western R. Co.* v. *Wood,* 99 Va. 156, 37 S. E. 846, a railroad case; 14 A. L. R. (note) 155 *et seq.;* 62 A. L. R. (note) p. 1171.

Dame's executor did not testify, did not introduce the driver of the Dame truck or any of the other men who were in it when the plaintiff hailed it, and produced no evidence to show why he did not do so. The plaintiff contends that this fact, taken in conjunction with the facts to which the witnesses testified, was sufficient to raise an inference that the driver did have the authority, express or implied, to permit or invite the plaintiff to ride, and to make the existence of such authority a question for the jury. This contention is not well made. It carries the principle upon which the plaintiff relies further than the principle warrants.

The burden was on the plaintiff to establish the authority, express or implied, of the driver to permit or invite him to ride. The evidence on this point, which presented no material conflict, was insufficient, as a matter of law, to carry that burden and sustain a verdict finding that the driver of the Dame truck had such authority. Under these circumstances the case stood before the jury as if it were established that "the driver of the Dame truck had no authority, express or implied, to permit plaintiff to ride upon the truck." This is what the court, in effect, told the jury, and, under the state of facts appearing from the record, it committed no reversible error in so doing.

A servant who is driving an ordinary passenger automobile or freight truck for his master has no ostensible authority by virtue of such employment to suffer, permit, or invite another person to ride therein for a purpose which has no connection with his master's business. One

so riding in such an automobile by the sufferance, permission, or invitation of the servant-driver, given either in violation of his master's instructions or without express or implied authority from the master to grant such permission, stands as to the master in the shoes of a trespasser. He cannot recover from the master for his *negligence* in permitting the automobile to be operated with defective brakes or other equipment, or for the *negligence* of his servant in the operation of the automobile, even though the negligence be gross, if it falls short of being such conduct as amounts to the wilful or wanton injuring of the rider. *Clover Creamery Co.* v. *Kanode*, 142 Va. 542, 129 S. E. 222; *Norfolk & Western R. Co.* v. *Wood*, 99 Va. 156, 37 S. E. 846, a case involving a railway train; Blashfield's Cyclopedia of Automobile Law, pp. 792, 1379; 14 A. L. R. (note), p. 145 *et seq.;* 62 A. L. R. (note), p. 1167 *et seq.;* and cases listed in footnote.[4]

The fact that a negligent act of the master or of his servant, which results in injuring such a rider in a master's automobile, may be a breach of the master's duty to other persons injured thereby and as to them constitute actionable negligence does not operate to make it actionable negligence on the part of the master *quoad* such rider. There must be a particular duty owing to the rider by the master. If there is not, there can be no actionable

---

[4] Cases involving freight trucks: *Monnet* v. *Ullman*, 129 Ore. 44, 276 Pac. 244; *Wing* v. *Martin*, 101 Vt. 108, 141 Atl. 602; *Hartigan* v. *Public Ledger*, 291 Pa. 588, 140 Atl. 524; *Barker* v. *Dairymen's Milk Products Co.*, 205 Ala. 470, 88 So. 588; *Zavodnick* v. *A. Rose & Son*, 297 Pa. 86, 146 Atl. 455; *Bobos* v. *Krey Packing Co.*, 317 Mo. 108, 296 S. W. 157; *Magnolia Petroleum Co.* v. *Winkler* (Tex. Civ. App.), 40 S. W. (2d) 831; *Mayhew* v. *De Coursey*, 135 Kan. 184, 10 Pac. (2d) 10; *Hartman* v. *Badger Tobacco Co.*, 210 Wis. 519, 246 N. W. 577.

Cases involving passenger automobiles: *Psota* v. *Long Island R. Co.*, and *Andrews*, 246 N. Y. 388, 159 N. E. 180, 62 A. L. R. 1163; *Collar* v. *McMullin*, 107 W. Va. 440, 148 S. E. 496; *Walker* v. *Fuller*, 223 Mass. 566, 112 N. E. 230; *White* v. *Brainerd Service Motor Co.*, 181 Minn. 366, 232 N. W. 626; *Union Gas & Elec. Co.* v. *Crouch*, 123 Ohio St. 81, 174 N. E. 6, 74 A. L. R. 160; *Bilow* v. *Kaplan*, 11 N. J. Misc. 108, 164 Atl. 694; *Greeson* v. *Bailey*, 167 Ga. 638, 146 S. E. 490.

Case involving motorcycle equipped with side car for delivery of packages: *Perry Supply Co.* v. *Brown*, 221 Ala. 290, 128 So. 227.

negligence as to him on the part of the master. Although a defendant may have owed a duty to other persons to do an act, the omission of which resulted in injury to the plaintiff, yet if he did not owe that duty to the plaintiff, as to him the omission is not actionable negligence. 1 Sherman & Redfield on Neg. (6th Ed.), sections 3-8; 2 Cooley on Torts (3d Ed.), pp. 1410-1413; *Norfolk & Western R. Co.* v. *Wood,* 99 Va. 156, 37 S. E. 846.

But even were the evidence sufficient to support a finding that the driver of the Dame truck had authority from Dame to permit or invite the plaintiff to ride therein, he would have been at the most a mere guest of Dame, and, therefore, would not be entitled to recover on the record here before us. See *Boggs* v. *Plybon,* 157 Va. 30, 160 S. E. 77, which was decided after this case was tried, but about three months before judgment was rendered therein; *Jones* v. *Massie,* 158 Va. 121, 163 S. E. 63; *Collins* v. *Robinson,* 160 Va. 520, 169 S. E. 609; *Young* v. *Dyer, ante,* page 434, 170 S. E. 737; *White* v. *Gregory, ante,* page 414, 170 S. E. 739.

We deem it unnecessary to discuss either the instructions asked for by the plaintiff which were refused or those asked for by him which were given, further than to say that the court did not err in refusing to give any of those which it refused to give, and that on a new trial no instruction should be given which conflicts with the views herein expressed.

The plaintiff in error failed to make, either in his petition or in his brief, a statement of facts of this case in conformity with rule 2 of this court; and has thereby materially added to the burden of the court in reviewing this case. It is one of the duties owed by counsel to the court to see that this rule is complied with, and they should not by a failure to observe it force the court either to permit the client to suffer because of counsel's failure to comply with this rule, or do the additional work which their failure to comply with it necessitates.

██ The judgment of the court will be affirmed so far as it is a judgment in favor of Dame's executor. In so far as it is a judgment in favor of the town of Christiansburg it will be reversed, and the case remanded for a new trial to be had as to it, the proceedings therein to be not in conflict with the views herein expressed.

*Affirmed as to Dame's executor;*
*Reversed as to town of Christiansburg.*